Thomas v Northwell Health, Inc. (2025 NY Slip Op 50110(U))

[*1]

Thomas v Northwell Health, Inc.

2025 NY Slip Op 50110(U)

Decided on January 30, 2025

Supreme Court, Kings County

Mallafre Melendez, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on January 30, 2025
Supreme Court, Kings County

Janice Thomas, as Administrator of the Estate of E.T., and JANICE THOMAS, Individually, Plaintiffs,

against
Northwell Health, Inc., LONG ISLAND JEWISH MEDICAL CENTER and COHEN CHILDREN'S MEDICAL CENTER, Defendants.

Index No. 513723/2019

Plaintiff
Benjamin S. Goldstein, Esq. (info&commat;ggpilaw.com)
Goldstein & Goldstein, P.C.
26 Court St, Fl 20
Brooklyn, NY 11242
718-855-0551
Defendants
Tricia Marie Criscito, Esq. (t.criscito&commat;bpn.law)
Barker Patterson Nichols LLP
300 Garden City, Plaza Suite 100
Garden City, NY 11530
516-282-3355

Consuelo Mallafre Melendez, J.

Recitation, as required by CPLR §2219 [a], of the papers considered in the review:
NYSCEF No.s: 60 — 81, 82 — 84, 85 - 87
Defendants Northwell Health, Inc. and Long Island Jewish Medical Center d/b/a The Steven and Alexandra Cohen Children's Center of New York, sued herein as Cohen Children's Medical Center, move (Seq. No. 3) for an Order, pursuant to CPLR 3212, granting summary judgment in their favor and dismissing all claims against them. Plaintiff opposes the motion.
Plaintiff commenced this medical malpractice action on June 20, 2019, as administrator of the estate of deceased nine-year-old E.T. ("Decedent'). Decedent presented to the hospital with recent onset neurological symptoms which progressively worsened during his four-day admission; he died from brain herniation secondary to an undiagnosed brain tumor. Plaintiff asserts claims of medical malpractice, negligent hiring and supervision, and wrongful death against the defendant hospital.
Prior to the events at issue, on June 5 and June 9, 2017, Decedent was taken twice to the ER at Kingsbrook Jewish Medical Center and Interfaith Medical Center with complaints of headaches, stomach pains, and vomiting. He had no prior history of serious health issues. On the morning of June 11, 2017, he fell down while trying to get out of bed and was admitted to SUNY Downstate Hospital with altered mental status, left-sided facial droop, and left arm and leg weakness. That evening he was transferred to the pediatric ICU at Kings County Hospital Center. His CT scans and MRI did not show signs of bleed, ischemia, or stroke, and he was suspected to have viral meningitis/encephalitis. By June 17, 2017, his symptoms showed significant improvement, his left-sided upper and lower extremity strength had returned to 5/5, and he was deemed stable for discharge with follow-up neurology and infectious disease appointments.
On June 18, 2017, the day after his discharge from Kings County Hospital, Decedent was admitted to Cohen Children's Medical Center (a division of Long Island Jewish Medical Center and part of the Northwell Health system) after vomiting blood. His medical history was documented, including the recent hospitalization for left-sided paralysis. His bloodwork showed elevated white blood cell count, platelet, and lipase enzymes. During his examination in the emergency department, a nurse recorded he had a brief episode of slurred speech and right facial droop. A CT scan and neurology consult was ordered at approximately 5:00 p.m. The CT scan report noted possible Dandy-Walker malformation and "prominent ventricles worrisome for hydrocephalus," and recommended further MRI imaging and cerebrospinal fluid flow study.
Decedent received a neurology consult at approximately 9:12 p.m. His chart noted the patient was agitated and had progressively worsening neurological symptoms. The attending neurosurgeon, Steven Schneider, M.D. ("Dr. Schneider"), determined that Decedent did not need acute neurosurgical intervention, and he was diagnosed as having meningitis of unknown origin.
On the early morning of June 19, a rapid response team was called due to Decedent's bradycardia, hypertension, and altered mental status. At approximately 5:00 a.m., he was transferred to the pediatric ICU, intubated, and underwent a CT angiogram.
Decedent was evaluated by the pediatric neurosurgery P.A. and Dr. Schneider, who recorded that a seizure had occurred moments before 10:00 a.m. Decedent was nonverbal and unable to follow commands. Dr. Schneider recommended MRI, MRA, and MRV imaging and neurology checks every hour, but did not recommend surgical intervention. Decedent's condition continued to deteriorate on June 19 and June 20. An MRI on June 20 revealed "marked interval progression" of cerebral edema and swelling, raised intracranial pressure, impaired arterial flow, brain herniation and brain stem compression. A lumbar puncture and cerebrospinal fluid profile were unable to be obtained due to his cardiovascular instability.
Decedent ultimately lost brain stem reflexes and was declared brain dead at 2:41 p.m. on June 22. With consent of his family, his ventilator was removed at 6:09 p.m. and he passed away minutes later.
An autopsy determined that Decedent's cause of death was brain herniation from cerebral [*2]edema, resulting from a diffuse leptomeningeal glioneuronal tumor. The report noted this was a "rare and surprising diagnosis," and this type of pediatric brain tumor was only recently classified by the World Health Organization in 2016.
Plaintiff alleges that Cohen Children's Medical Center, through its physicians and staff, departed from good and accepted medical standards in treating Decedent's cerebral edema. Specifically, Plaintiff alleges that they failed to timely order an MRI imaging study, failed timely transfer to pediatric ICU, and failed to place an external ventricular drain and ventriculoperitoneal shunt. Plaintiff further alleges that Decedent's injuries, including brain herniation and death, were proximately caused by these departures.
In evaluating a summary judgment motion in a medical malpractice case, the Court applies the burden shifting process as summarized by the Second Department:
"The elements of a medical malpractice cause of action are a deviation or departure from accepted community standards of practice, and that such departure was a proximate cause of the plaintiff's injuries. When moving for summary judgment, a defendant provider has the burden of establishing the absence of any departure from good and accepted medical practice or that the plaintiff was not injured thereby. In order to sustain this burden, the defendant must address and rebut any specific allegations of malpractice set forth in the plaintiff's bill of particulars. In opposition, the plaintiff must demonstrate the existence of a triable issue of fact as to the elements on which the defendant has met his or her initial burden. General allegations of medical malpractice, merely conclusory and unsupported by competent evidence tending to establish the essential elements of medical malpractice, are insufficient to defeat a defendant's summary judgment motion. Although summary judgment is not appropriate in a medical malpractice action where the parties adduce conflicting medical expert opinions, expert opinions that are conclusory, speculative, or unsupported by the record are insufficient to raise triable issues of fact." (Barnaman v Bishop Hucles Episcopal Nursing Home, 213 AD3d 896, 898-899 [2d Dept 2023] [internal quotation marks and citations omitted].)
In support of the motion, Defendants submit an expert affirmation from Jeffrey Wisoff, M.D. ("Dr. Wisoff"), a licensed physician who is board certified in neurological surgery and pediatric neurological surgery. Dr. Wisoff has laid a proper foundation to opine on the issues in this case, including diagnosis and treatment of intracranial pressure, swelling, and brain tumors.
Dr. Wisoff opines that all treatment and care rendered to Decedent from June 18, 2017 through June 22, 2017 was in compliance with the standard of care. He opines that a proper and complete medical history was obtained when Decedent presented to the emergency department, including his recent hospitalization and the multiple visits to other emergency departments and his primary care provider in the week preceding that hospitalization. Dr. Wisoff opines that his various symptoms were "consistent with basilar meningitis," an inflammation in the brain typically caused by infection. He opines that a tumor being the source of this inflammation is "rare and would be very low on the differential diagnosis," and Decedent had other symptoms such as elevated white blood count and abdominal pain which were more consistent with tuberculosis or fungal infection than a tumor. The expert also opines that his prior medical records — including the lumbar puncture results and MRI from Kings County Hospital — indicated that infectious meningitis was "the highest probability" diagnosis. Therefore, he opines the defendants did not depart from the standard of care by responding to his symptoms with a [*3]working diagnosis of meningitis, and that they complied with the standard of care for treated a suspected case of infectious meningitis.
Dr. Wisoff also opines that "nothing about [Decedent's] condition appeared to be critical" based on his initial vital signs in the emergency department. Because his episode of facial droop and slurred speech resolved within minutes, and his vital signs remained stable, the expert opines that it was not a departure from the standard of care to admit Decedent to a regular floor rather than the pediatric ICU.
Dr. Wisoff opines that Decedent's presenting condition did not indicate "increased intracranial pressure or tumor" was likely, but nonetheless a CT scan and neurosurgery consult was timely requested to rule out this possibility. Dr. Wisoff further opines that the CT scan on June 18, 2017 at 5:00 p.m. did not indicate "a tumoral process or the presence of raised/increased intracranial pressure," and it also did not indicate "impending signs" of brain herniation. He opines that the prominent ventricles noted on the radiology report were "non-specific" and "clinically insignificant" findings, sometimes caused by a congenital anomaly such as Dandy-Walker malformation. Though the expert notes that this anomaly can be concerning for hydrocephalus — a build-up of cerebrospinal fluid — he opines that there were no signs of increased intracranial pressure in this CT scan, and Decedent did not have papilledema (optic swelling). Therefore, he opines that hydrocephalus was not present.
Dr. Wisoff opines that the neurosurgery consultation at approximately 9:00 p.m. by Dr. Schneider and P.A. David Engelman was timely and appropriate. In the expert's opinion, the standard of care based on Decedent's initial CT scan and presentation at that time did not require neurosurgical intervention. He opines that the ventricle prominence "was not clinically significant" and "no other findings on the CT warranted intervention." Dr. Wisoff also opines that Dr. Schneider appropriately recommended further testing by MRI, MRA, and MRV, due to his impression of encephalopathy and possible vascular insufficiency, but the expert opines that the standard of care did not require this testing be done "on an urgent basis." Dr. Wisoff also notes that another CT scan of the head was performed at approximately 3:30 a.m. on June 19, which showed "no major change" from the previous CT scan. He opines that the CT scan again showed "mild prominence of the ventricular system" but otherwise no significant abnormalities, and further MRI evaluation was appropriately recommended.
Dr. Wisoff notes that Decedent was reevaluated by the neurosurgical team shortly after 4:00 a.m. due to concerning blood pressure, heart rate, and "waxing and waning neurologic status." At that time, Decedent was "drowsy by easily awakened," able to follow commands, and had good strength in extremities. Dr. Wisoff opines that the plan for transfer to the pediatric ICU was appropriate, due to his change in condition, and until that time he was being appropriately treated and monitored on the regular medical floor. He also opines that Dr. Schneider correctly determined that "there was no need for acute neurosurgical intervention," because Decedent's ventricular prominence was unchanged, there were no signs of increased intracranial pressure, and the CT angiogram showed no sign of venous thrombosis or hemorrhage.
At approximately 10:00 a.m., Decedent had a seizure shortly before his neurology examination. Dr. Wisoff opines that a grand mal seizure was "consistent with the diagnosis of meningitis" and Decedent still displayed no signs of hydrocephalus. Dr. Wisoff therefore opines that neurologist Dr. Schneider did not depart from the standard of care by not recommending or performing neurosurgical intervention.
Dr. Wisoff opines that the first MRI performed at approximately 1:56 p.m. on June 19 [*4]was timely, as it was "less than 24 hours after admission to the hospital and approximately 10 hours after neurosurgery saw the patient and it was recommended." He opines this timeline was in accordance with the standard of care, given the "non-specific" and overall "reassuring" findings from the CT scans and CT angiogram. He notes that the results of this MRI were again consistent with meningeal inflammation, with impressions including "restricted diffusion involving the left cerebral hemisphere" and "mild prominence of the ventricular system." The expert opines that the radiological studies were not common for a tumor, but instead consistent with "the evolution of meningitis with ischemic tissue without evidence of increased intracranial pressure." He opines these studies did not indicate "neurosurgical intervention" was required.
From this time, Decedent's condition rapidly deteriorated. His MRI on June 20 showed "marked interval progression of the brain edema and swelling" and "new downward herniation of the cerebral hemispheres." Dr. Wisoff opines that based on Decedent's symptoms, clinical findings, and radiological studies prior to this June 20 MRI, Decedent's condition was reasonably considered to be "meningitis of unclear etiology" and there was no earlier evidence of "tumor, increased intracranial pressure, or impending herniation." Thus, he opines that the working diagnosis of viral or tuberculous meningitis was not a departure from the standard of care. He also opines that a lumbar puncture was appropriately considered but not feasible given his unstable cardiovascular condition.
Further, Dr. Wisoff opines that no alleged departures from the standard of care were the proximate cause of Decedent's injuries or death. On the rapid deterioration the morning of June 19 which prompted his transfer to the pediatric ICU, Dr. Wisoff opines that Decedent's "change in vital signs and change in mental status was related to seizure activity and not increased intracranial pressure." Dr. Wisoff notes that Decedent was ultimately diagnosed post-mortem with brain herniation secondary to cerebral edema, caused by a diffuse leptomeningeal glioneuronal tumor. The expert notes that this is very rare tumor and its "prognosis is variable and dependent on the nature and extent of the tumor and its pathology." He opines that such a tumor is normally "slow and insidious," but in this case Decedent had an aggressive and atypical progression of symptoms over just a few weeks, and he was brain dead approximately 72 hours after admission to Cohen Children's Medical Center.
Dr. Wisoff opines that despite being provided "the highest level of care to try to properly and timely diagnose" Decedent's condition, including multiple consults with neurology, neurosurgery, infectious disease, and rheumatology specialists, the progression of his tumor was too quick and advanced for diagnosis to be possible in the time available. Dr. Wisoff notes that regardless of the timing of various tests (including CT angiogram, MRI, lumbar puncture), only a brain biopsy would have been able to diagnose Decedent's tumor — the results of which would not be available for several days — and therefore it would have been impossible to diagnose and prevent the tumor's progression in the short time before his death. Thus, Dr. Wisoff opines there was nothing further the treating physicians at Cohen Children's Medical Center could have done from June 18 to June 22 to diagnose and effectively treat this underlying condition, which he opines rapidly caused a deprivation of oxygen and blood flow to the brain, swelling, herniation, and death.
Based on the expert submissions, the movants have met their prima facie burden by establishing the treatment and care provided to Decedent was within good and accepted medical standards during Decedent's June 18 to June 22, 2017 hospitalization at Cohen Children's Medical Center. The expert opines that the physicians and specialists acted within the standard [*5]of care in their diagnosis of meningitis and performed timely testing and ICU transfer as his condition worsened. The expert also opines that no neurosurgical intervention was indicated by his symptoms.
Additionally, Dr. Wisoff establishes prima facie that no departures from the standard of care were the proximate cause of Decedent's injuries and death. The expert opines that despite the hospital's treatment and care, this was an unavoidable outcome of the rare and aggressive tumor which was only diagnosed after his death.
For the same reasons, the movants have also established prima facie entitlement to summary judgment on the wrongful death claim, as an essential element of that claim is that the party's death was proximately caused by the acts or omissions of the defendant. The burden therefore shifts to Plaintiff to raise an issue of fact on these claims.
In opposition to the motion, Plaintiff submits an expert affirmation from a licensed physician, (name of expert redacted), board certified in neurosurgery. The Court was a signed, unredacted, and notarized copy of this affirmation for in camera inspection. The expert has laid a foundation to opine on the treatment and care at issue, affirming that they have treated numerous intracerebral conditions involving increased intracranial pressure. Although the movants argue in reply that this expert has not established any qualifications specific to pediatric patients or brain tumors, the Court finds that the opinions stated by Plaintiff's expert primarily involve the symptoms and treatment of hydrocephalus and intracranial pressure, which they have laid a proper foundation to discuss.
Plaintiff's expert opines that Cohen Children's Medical Center, through its physicians and staff, departed from the standard of care in their treatment of Decedent. The expert opines that from his initial presentation, Decedent had "multiple symptoms pointing to an ongoing intracerebral process and a progressive increase in the child's intracranial pressure," and that the defendant physicians failed to appropriately treat this build-up of pressure.
The expert notes that Decedent presented to the defendant hospital, according to their records, as a "previously healthy 9-year-old" who had been hospitalized for the previous week with sudden left-sided paralysis. After his arrival to the emergency department on June 18, 2017, at approximately 11:48 a.m., the expert opines that he again showed evidence of muscle weakness and "drift" in his left leg on a motor leg lift test. Later, during an eye exam, he was observed to have right-sided facial droop, slurred speech, and agitation. The expert opines that these symptoms taken together were concerning for "an ongoing, intracranial event, and one in immediate need of comprehensive neurologic and neurosurgical care."
The expert notes that the radiology report of his CT scan, reviewed at 5:52 p.m. on June 18, included "prominent ventricles, worrisome of hydrocephalus," i.e., an "excessive accumulation of cerebrospinal fluid within the brain." The expert counters the opinion of the movant's expert that these CT scan findings were "non-specific" and did not indicate neurosurgical treatment was warranted. Instead, Plaintiff's expert opines that the concern for hydrocephalus constituted "a medical emergency," and the standard of care required drainage of the cerebral spinal fluid to stop the increase of intracranial pressure.
Further, the expert notes that in the early morning of June 19, at 2:58 a.m., the attending pediatric physician recorded that another neurosurgical consult was requested due to "vital signs consistent with Cushing's triad," but then stated that "emergency department team [was] reassured, told initial CT showed minimal hydrocephalus, no signs of herniation." Plaintiff's expert explains that "Cushing's triad" is a set of symptoms — bradycardia, irregular respirations, [*6]and widened pulse pressure — which are "directly indicative of an increase in the patient's intracranial pressure" when present at the same time. Plaintiff's expert opines based on the medical record that Decedent did demonstrate all three of these symptoms, and it was a departure from the standard of care for the neurosurgical team to not intervene at that time. Specifically, the expert opines that the standard of care required the placement of an external ventricular drain to drain cerebrospinal fluid, an immediate MRI imaging study, immediate transfer to the pediatric ICU, and the placement of a ventriculoperitoneal shunt to continue draining fluid and relieving intracranial pressure.
On the issue of proximate causation, Plaintiff's expert opines that Decedent's brain herniation and death were directly caused by his unrelieved brain edema and intracranial pressure, and therefore his worsened brain injury and death could have been avoided if the aforementioned interventions had been undertaken. While the movant's expert argues that Decedent died from a tumor that was too aggressive and advanced to be diagnosed and treated during the time at issue, Plaintiff's expert opines that the presence of the tumor was not the sole cause of Decedent's death — instead, he opines that Decedent died from the intracranial pressure, cerebral edema, and brain herniation which could have been halted with proper treatment.
Plaintiff's expert submissions have sufficiently raised issues of fact as to the hospital's compliance with the standard of care through its physicians and employees. "When experts offer conflicting opinions, a credibility question is presented requiring a jury's resolution" (Stewart v. North Shore Univ. Hosp. at Syosset, 204 AD3d 858, 860 [2d Dept. 2022] citing Russell v. Garafalo, 189 AD3d 1100, 1102 [2d Dept. 2020]). Here, the experts offer starkly conflicting opinions on whether Decedent's complaints and CT scans showed evidence of cerebrospinal fluid build-up and intracranial pressure, which Plaintiff alleges constituted a medical emergency and warranted more urgent testing and neurosurgical intervention. Contrary to the movants' argument in reply, Plaintiff's expert sufficiently supported this opinion with citations and quotes from the medical record and CT scan findings, even if the expert did not personally review and interpret the radiological films. Furthermore, Plaintiff's expert disagrees with the movant as to whether Decedent had clinical symptoms of intracranial pressure (i.e., "Cushing's triad") which also required neurosurgical intervention and drainage of fluid.
Plaintiff's expert has also offered a conflicting opinion as to how these alleged departures proximately caused Decedent's pain, suffering, and death. Plaintiff's expert opines that regardless of the tumor, which was not diagnosed until the post-mortem autopsy report, the immediate cause of Decedent's death was the progression of his cerebral edema and brain herniation. The expert opines that appropriate neurosurgical and ICU intervention, including the placement of a ventricular drain and ventriculoperitoneal shunt, could have relieved excess accumulated fluid, increased his chance of survival, and prevented this outcome.
Plaintiff has also raised issues of fact to preclude summary judgment as to the wrongful death claim, providing a conflicting expert opinion that Decedent's death from brain herniation was proximately caused by the alleged failure to properly and timely treat his symptoms of increased intracranial pressure.
On the negligent hiring and supervision claim, the movants established prima facie entitlement to summary judgment as a matter of law. "Generally, where an employee is acting within the scope of his or her employment, the employer is liable for the employee's negligence under a theory of respondeat superior and no claim may proceed against the employer for negligent hiring, retention, supervision or training," except where the plaintiff alleges "gross [*7]negligence in the hiring or retention of the employee" (Talavera v Arbit, 18 AD3d 738 [2d Dept 2005]).
Here, it is undisputed by the parties that the defendants are liable for any malpractice on the part of Cohen Children's Medical Center physicians under the respondeat superior doctrine. The cause of action for negligent hiring and/or supervision is therefore not applicable here. The exception for gross negligence in the hiring of any specific hospital employees is not supported by any allegations or facts in the record.
Plaintiff does not address or raise any issues of fact on the negligent hiring/supervision claim. Accordingly, summary judgment is granted to the movants on this cause of action only.
It is hereby:
ORDERED that Defendants Northwell Health, Inc., Long Island Jewish Medical Center, and Cohen Children's Medical Center's motion (Seq. No. 3) for an Order, pursuant to CPLR 3212, granting summary judgment in their favor and dismissing all Plaintiff's claims against them, is GRANTED TO THE EXTENT of dismissing Plaintiff's cause of action for negligent hiring and/or supervision, and the motion is otherwise DENIED.
This constitutes the decision and order of this Court.
Hon. Consuelo Mallafre Melendez